UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **BRAKE LANDSCAPING &, LAWNCARE, INC.,** ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case number 4:08cv01490 TCM |
| **HAWKEYE-SECURITY INS. CO., and THE MIDWESTERN INDEMNITY CO.,** ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This declaratory judgment action is again before the Court on a motion for summary judgment. The motion now at issue is one filed by defendants, Hawkeye-Security Insurance Company ("Hawkeye") and The Midwestern Indemnity Company ("Midwestern").

**Background**

Brake Landscaping & Lawncare, Inc. ("BL&L"), established and owned by Robert Brake, is a "full service" landscaping company. (Brake Dep.[1] at 15; Defs. Stat. of Facts[2] ¶ 4.) The majority of its customers are businesses. (Brake Dep. at 16.)

Between April 21 and 28, 2008, Jeffrey McGee, an employee of BL&L,[3] applied Lesco Prosecutor to 13 properties of 12 customers. (Defs. Stat. of Facts ¶¶ 5, 16; Brake Dep.

---

[1]Portions of Brake's deposition were submitted by Defendants as Exhibit 2.

[2]"Stat. of Facts" refers to the designated party's statement of uncontroverted facts. Only those paragraphs that are admitted by the opposing party are cited.

[3]McGee left BL&L's employment soon after the events giving rise to this litigation.

at 32, 36, 153.) All but one customer had a lawn care maintenance agreement then in place with BL&L. (Brake Dep. at 48, 67, 153.) The one that did not was a residential customer who was related to Brake. (Id. at 49, 67.) Included in BL&L's maintenance agreements was a provision for various turf applications. (Id.) BL&L had a five application program; however, the number of applications varied by customer. (Id.) Some customers wanted all five, some none, and some four, three, or two. (Id.) The applications were done at different times of the year for different purposes. (Id. at 50.) For instance, the first two were to prevent crab grass. (Id.) The second of the two-step crab grass prevention program included an application of Momentum, a selective herbicide, for spot weed control. (Id. at 50-52, 57.) Spot weed control is also the purpose of the third and fourth applications. (Id. at 52.)

Instead of applying Momentum, McGee applied Prosecutor, a non-selective herbicide designed to kill vegetation, when doing the second application. (Defs. Stat. of Facts ¶¶ 5, 8.) Its active ingredient is Isoproplylamine salt of Glyphosate. (Id. ¶ 9.) "Once [glyphosate] has been applied to a plant it immediately begins to kill the plant. There are no antidotes and the effects are irreversible." (Defs. Ex. 3 ¶ 11.)

The spraying equipment included a 300-gallon tank and sprayer. (Brake Dep. at 65-66, 159; Defs. Stat. of Facts ¶ 6.) At least one lawn required more than one tank-full of herbicide, and was, therefore, more than a one-day job. (Brake Dep. at 159.)

On April 28, Brake found out that the wrong chemical had been sprayed on the 13 properties. (Defs. Stat. of Facts ¶ 20.) Which properties had been affected was discovered by driving by customers' properties and seeing if their lawns were showing dying vegetation.

(Brake Dep. at 68.) The effects usually show in seven to ten days, depending on such factors as the weather, ground temperature, and dilution ratio. (Id. at 39, 58.) BL&L had the dead spots on the customers's lawns resotted or seeded. (Id. at 107-08.) There was also some damage to at least two customers's shrubs and perennials. (Brake Dep. at 71.)

As of the date when Brake's deposition was taken, March 13, 2009, none of the customers affected by the erroneous spraying had sued BL&L. (Id. at 105.) No customer was charged for that spraying. (Id. at 143.)

At all times relevant, BL&L had two business owners insurance policies: one, a Commercial General Liability ("CGL") Policy, number CBP 8340291, was issued by Midwestern, and the other, a Commercial Umbrella Liability ("CUL") Policy, number CU 8340391, was issued by Hawkeye. (Pl. Exs. 1A, 2A.) Both policies were issued for a one-year period beginning November 1, 2007. (Id.) Both define an "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions . . . ." (Pl. Exs. 1A at 38, 2A at 97.) The CGL adds "that results in 'bodily injury' or 'property damage'" after "conditions." (Pl. Ex. 1A at 38.)

The CGL policy includes a provision excluding, in relevant part:

(2) j. Damage to Property

"Property damage" to:

. . .

    5.    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on

> > your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> > 6. That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Pl. Ex. 2A at 86.)

The CUL policy includes these same two exclusions. (Pl. Ex. 1A at 28.)

The CGL policy includes another provision reading that the exclusion in (2)(j)(6) "does not apply to 'property damage' included in the 'products-completed operations hazard.'" (Pl. Ex. 2A at 87.) A "products-completed operations hazard" is defined as:

> [A] "[p]roducts-completed operations hazard":
>
> > a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> > . . .
>
> > (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
> > > (a) When all of the work called for in your contract has been completed.
>
> > > (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>
> > > (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> > Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(P. Ex. 1A at 39.)

Although the CUL also includes a "products-completed operations hazard" exception, in the CUL policy the exception applies to paragraph 3(o)(5), not subparagraph (6). (Pl. Ex. 2A at 87.) The definition of a "products-completed operations hazard" is the same. (Id. at 98.)

Both Defendants argue that the damage at issue was not caused by an "occurrence"; consequently, there is no coverage. Alternatively, if the work is an "occurrence," it is nonetheless not covered because the two policies exclude damage to (a) that particular part of real property on which BL&L was performing operations and (b) that particular property that must be restored, repaired, or replaced because BL&L's work was incorrectly performed on it.

## Discussion

The standard governing the review of summary judgment motions was set forth in the Court's earlier memorandum and order addressing BL&L's motion for partial summary judgment and is incorporated herein by this reference.

In this insurance dispute, Missouri law is applicable, see **J.E. Jones Const. Co. v. Chubb & Sons, Inc.**, 486 F.3d 337, 340 (8th Cir. 2007); **Capitol Indemn. Corp. v. 1405 Assocs., Inc.**, 340 F.3d 547, 549 (8th Cir. 2003), and holds that an insurance policy is a contract governed by the rules of contract construction, see **Leonards v. Southern Farm Bureau Cas. Ins. Co.**, 279 F.3d 611, 613 (8th Cir. 2002); **Blair v. Perry County Mut. Ins. Co.**, 118 S.W.3d 605, 606 (Mo. 2003) (en banc). "Under Missouri law, the claimant has the

burden to show that the policy covers the loss," **J.E. Jones Const.**, 486 F.3d at 340; however, "'the insurer has the burden of proving that an insurance policy exclusion applies,'" **Am. Econ. Ins. Co. v. Jackson**, 476 F.3d 620, 623 (8th Cir. 2007) (quoting Am. Family Mut. Ins. Co. v. Co Fat Lee, 439 F.3d 436, 439 (8th Cir. 2006)). Accord **Am. States Ins. Co. v. Mathis**, 974 S.W.2d 647, 649 (Mo. Ct. App. 1998). "An exclusion relied upon to deny coverage must be clear and free from doubt." **Jackson**, 476 F.3d at 623 (internal quotations omitted); accord **Freeman v. State Farm Mut. Auto. Ins. Co.**, 436 F.3d 1033, 1035 (8th Cir. 2006). "If there is any ambiguity in the policy, it inures to the benefit of the insured, not the insurer." **Machea Transp. Co. v. Philadelphia Indem. Co.**, 463 F.3d 827, 832 (8th Cir. 2006). "Mere disagreement by the parties[, however,] regarding a contract term's interpretation does not render the term ambiguous." **Lindsay v. Safeco Ins. Co.**, 447 F.3d 615, 617 (8th Cir. 2006); accord **Cincinnati Ins. Co. v. Venetian Terrazzo, Inc.**, 198 F. Supp.2d 1074, 1078 (E.D. Mo. 2001).

BL&L, the insured/claimant, argues that the loss at issue is covered because it is an "occurrence" within the meaning of both policies.

"Where an insurance policy defines an 'occurrence' as meaning an accident,' [as do the CGL and CUl policies], the term 'accident' is given its common meaning:

> 'An event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event. Hence, often an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; . . . .'"

**J. E. Jones Const.**, 486 F.3d at 341[4] (quoting Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d 419, 425 (Mo. Ct. App. 1999)); accord **Columbia Mut. Ins. Co. v. Epstein**, 239 S.W.3d 667, 672 (Mo. Ct. App. 2007); **Mathis**, 974 S.W.2d at 650. Consistent with this definition, breaches of contract are not "accidents" or "occurrences," **id.**, but negligent acts are, **J.E. Jones Const.**, 486 F.3d at 341; **Wood v. Safeco Ins. Co. of Am.**, 980 S.W.2d 43, 49 (Mo. Ct. App. 1998). See also **Valentine-Radford, Inc. v. Am. Motorists, Ins. Co.**, 990 S.W.2d 47, 52 (Mo. Ct. App. 1999) (negligence claim qualified as "occurrence").

Although this principle may be simply stated, it is not easily applied to claims such as BL&L's that are not framed by an underlying lawsuit.

In **Mathis**, the insured sought coverage under its CGL policy for claims against it by an electrical company that had subcontracted work to the insured and had then sought damages when the insured's defective work had to be torn out and replaced by work performed according to specifications. 974 S.W.2d at 648. The resulting lawsuit included three counts for breach of contract and one for negligence. **Id.** The insurer argued that it had no duty to defend or indemnify its insured because the defective work was within the insured's control and was not an accident; thus, there was no occurrence as required for coverage under the CGL policy. **Id.** at 649. The court agreed, finding that the "CGL policy does not serve as a performance bond, nor does it serve as a warranty of goods *or services*." **Id.** (emphasis added) (internal quotations omitted). The loss at issue having been caused by

---

[4]The cited cases all involve the same definitions for insurance terms that are included in the CGL and CUL policies at issue.

- 7 -

the insured's failure to perform the work according to contract specifications and the failure being within the insured's control and management, the complained-of damage "was a normal, expected consequence of [the insured's] breach of contract and not an occurrence." **Id.** at 650. This holding was followed by the Western District of Missouri in **St. Paul Fire and Marine Ins. Co. v. Building Constr. Enters., Inc.**, 484 F. Supp.2d 1004 (W.D. Mo. 2007), when determining whether an insurer had an obligation under two CGL policies to reimburse its insured for repairs to work it had done that had failed to comply with the client's specifications and for the costs of restoring property that was damaged as a result of the repair work. Noting that the repairs that had to be done were to honor the insured's contractual obligations, the court concluded that neither the repairs nor the restoration work were "accidents" or "occurrences" as defined in the CGL policies. **Id.** at 1010-11. Similarly, in **Venetian Terrazzo**, the Eastern District cited Mathis when concluding that substandard work performed by the insured under a contract was not an "occurrence" as defined in its CGL and CUL policies and, therefore, there was no coverage under either policy for negligence claims brought against the insured by a client. 198 F. Supp.2d at 1079. See also **Davis**, 6 S.W.3d at 425-26 (losses that were solely caused by insured's breaches of contractual obligations and of warranties were not "occurrences" or "accidents" under Mathis). Cf. **Epstein**, 239 S.W.3d at 672 (characterizing Mathis as "purely a breach of contract case" with the underlying claims being that the defendant/insured had failed to meet, either intentionally or negligently, some contract terms and finding that case before it – that defendant/insured had unknowingly used defective concrete when pouring plaintiffs'

foundation – was a products liability case; thus, Mathis did not apply and allegations of defects in the concrete and resulting damage to the home (a) were not foreseeable and (b) were of an accident or occurrence[5]).

The holding in Mathis and its progeny suggests that the damage caused by BL&L's employee's negligent use of the wrong herbicide when spraying BL&L's customers' lawns is not an "accident" or "occurrence" as required for coverage under either the CGL or CUL policy. Clearly, the employee was spraying the lawns pursuant to an agreement between the customers and BL&L that only the weeds, not the grass, was supposed to be killed. Any costs incurred by BL&L to remedy the employee's mistake would be to honor that agreement.

A few weeks after Mathis, however, a different division of the same district of the Missouri Court of Appeals held in **Wood**, 980 S.W.2d at 50, 52, that misrepresentations by an insured about the flooding of property were "occurrences" or "accidents" as required for coverage under the insured's *personal* umbrella policy. The court concluded that

> Missouri authority would allow negligent conduct to be encompassed by a liability policy providing coverage for an "occurrence" defined as an "accident." This comports with a reasonable person's expectation of liability coverage. A liability policy is designed to protect the insured from fortuitous injury caused by his actions. If the injury occurs because of carelessness of the insured, he reasonably expects the injury to be covered.

**Id.** at 50 (internal quotations omitted). In addition to relying on a similar case out of Maryland, the court noted that it had held in an earlier case, **Scottsdale Ins. Co. v. Ratliff**,

---

[5] There is no allegation that the nonselective herbicide used by BL&L's employee was defective; it simply was the wrong product to use.

927 S.W.2d 531, 534 (Mo. Ct. App. 1996), that a negligent termite inspection by a company was an "occurrence" within the meaning of the company's liability policy. The court further noted that its holding in **Ratliff** was "due, in significant part, to case law from other jurisdictions finding that a negligent termite inspection . . . constitutes an 'occurrence' for purposes of liability insurance." **Id.** (citing Ratliff, 927 S.W.2d at 533).

The court in Ratliff did not have the advantage of the holding in Mathis. The court in Wood did not cite Mathis. Both the Ratliff and Wood courts relied on cases from other jurisdictions. Moreover, the policy at issue in Wood was a *personal* umbrella policy whereas the policy at issue in Mathis was a *commercial* liability policy, a distinction crucial to that court's holding that contracted work that was improperly performed was not an "occurrence" or "accident," regardless whether the claim for damages caused by the defective work was phrased as a breach of contract or negligence. 974 S.W.2d at 650. But cf. **United Fire & Cas. Co. v. Fuhr Int'l, LLC**, 2006 WL 3691256 (W.D. Mo. 2006) (citing Wood, Ratliff, and Mathis when concluding that insurer had obligation under CGL policy to defend insured for negligence claim in suit against insured by insured's customer that insured had made error during manufacture of paint and other coatings applied by customer to customer's products, but also concluding that insurer had no duty to defend insured in regard to breach of contract claims filed by customer based on same allegations).

Without the framework of a complaint phrasing customers' claims against BL&L as either for breach of contract or for negligence, the Court relies on the Mathis line of cases holding that claims for repair or restoration costs caused by an insured's defective

performance of work due pursuant to a contract is not an "occurrence" or an "accident" as required under the two policies at issue. Moreover, even if the spraying was an "occurrence" or "accident" as required for coverage, the resulting damage would be excluded for the following reasons.

Assuming that BL&L established coverage, however, the burden shifts to Defendants to establish that an exclusion applies. Defendants argue that the "business risk" exclusion in both policies applies. This provision excludes property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; *or* [ ] [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (Pl. Exs. 1A at 28; 2A at 86) (emphasis added).

A policy including the first exclusion was at issue in **Columbia Mut. Ins. Co. v. Schauf**, 967 S.W.2d 74 (Mo. 1998) (en banc). The court noted that the intent of such a policy "is to protect against the unpredictable, potentially unlimited liability that can be caused by accidentally causing injury to other persons or their property." **Id.** at 77. The intent was *not* "to protect business owners against every risk of operating a business." **Id.** Rather, the risks "that are the normal, frequent, or predictable consequences of doing business, and which business management can and should control and manage" are excluded business risks. **Id.** (internal quotations omitted). Such "[e]xclusions are based on the apparently

simple premise that general liability coverage is not intended as a guarantee of the quality of an insured's product or work." **Id.** (alteration in original) (internal quotations omitted).[6]

The question in **Schauf** was whether a business risk exclusion applied, and, if so, the extent of the exclusion, to damage caused to a new house when a subcontractor hired to paint cabinets caused a fire when cleaning his spraying equipment, something he did as a normal part of his painting jobs. **Id.** at 79. The court rejected the insured's assertion that the exclusion did not apply because he was not painting when the fire started. **Id.** "To construe the exclusion so narrowly that it applies only at the moment an insured is intentionally touching the real property that is the object of his work would, in effect, read the exclusion out of the policy." **Id.** Thus, "[a]lthough Schauf was not directly producing an effect on real property when he started the fire, he was, nevertheless, performing operations on the [new] house." **Id.**

Similarly, the interpretation urged by BL&L is too narrow an exclusion. BL&L argues that the damage caused by its employee using the wrong herbicide is not excluded because the focus of its operations was the weeds in the lawn, not the grass. It was the lawn, however, that was sprayed. It was the lawn on which BL&L was performing its operations.

BL&L further argues that even if the exclusion applies, it applies only to the "particular part" on which it was performing its operations. BL&L urges the Court to find an ambiguity

---

[6]BL&L argues that excluding coverage for its employee's defective work negates the purpose of having insurance. The court in **Schauf** disagreed, noting that excluding business risks from commercial general liability policies (a) "lowers insurance rates" and (b) "provides an incentive for business owners to manage their businesses more effectively." 967 S.W.2d at 77.

in the "particular part" exclusion, as did the court in **Schauf**, 967 S.W.2d at 80, and to resolve the ambiguity in its favor. As noted above, the fire damage at issue in Schauf was caused by the insured cleaning his spraying equipment in a new house. **Id.** at 79. The cleaning was done in a different room than the one in which the painting had been done. **Id.** The insurer advocated an interpretation of "particular part" that would include the entire area of real property on which the painter was scheduled to work. **Id.** at 80. The insured advocated an interpretation that would include only that part that was the subject of his work at the time of the damage. **Id.** The court found each interpretation to be reasonable, and held that an ambiguity existed. **Id.** Consequently, the interpretation that was the more narrow exclusion, and therefore favored coverage, was to be applied. **Id.** at 80-81. Even so, the court found that the damage to the kitchen cabinets was *not* covered. **Id.** at 81. "[G]iving effect to the ordinary meaning of the exclusion's language and to the exclusion's purpose[,] . . . [t]he exclusion bars coverage for damage to [t]hat particular part of real property on which [the insured] *is performing operations*, not on which the insured *did perform operations, will perform operations,* or *has contracted to perform operations*."[7] **Id.** (fifth and six alterations in original) (internal quotations omitted). "Such a construction effectuates the exclusion's

---

[7] The Court earlier rejected BL&L's argument that the business risk exclusion did not apply because the exclusion uses the present tense, "are," and the grass did not immediately die. The undisputed evidence was that the grass was killed, although the effect of the deadly spraying was not immediately apparent. In **Stark Liquidation Co. v. Florists' Mut. Ins. Co.**, 243 S.W.3d 385, 398 (Mo. Ct. App. 2007), the court held that the *introduction* of a deadly bacteria to an orchard was the occurrence regardless of how long the harm from that bacteria continued. Similarly, the spraying of the non-selective herbicide was the occurrence, regardless of when the nonreversible, inevitable effects of the spraying became apparent.

- 13 -

purpose of denying coverage for business risks, but also allows coverage for any accidental, consequential damage to other's property, which is not considered a business risk." **Id.** The court held that the exclusion applied to damage caused to the kitchen cabinets by a fire started in a different room by the insured when cleaning his equipment used to paint those cabinets. **Id.**

Rather than support coverage, as urged by BL&L, the holding in Schauf excludes coverage. It is undisputed that the damage was caused by BL&L's employee using the wrong herbicide when spraying the customers' lawns. See **Id.** at 78 ("The possibility of damaging the property on which one is working is the type of routine, controllable, and limited risk that constitutes a business risk."). Although the effect of that operation was supposed to be the elimination of only the weeds, it is undisputed that the operation was performed on the lawns, i.e., the grass and the weeds. Also, there is no allegation that any plant material that was not intentionally sprayed was killed.[8] For instance, there is no claim that BL&L had to restore a lawn next door to a customer's property because wind blew the herbicide. Indeed, Brake testified that the damage was so confined that the zig-zag pattern of the employee's careless spraying could be detected in otherwise-green lawns.

Assuming that the spraying was an "occurrence," BL&L might yet prevail if it establishes that an exception to the business risk exclusion applies.

---

[8]Brake testified that some customers' shrubs and perennials had to be replaced. There is no allegation that those plants were not in a bed which was sprayed.

- 14 -

The CGL policy includes a "products-completed operations hazard" exception to subparagraph (6) in the definition of property damage; the CUL includes the same exception to subparagraph (5). Defendants argue that this exception does not apply because (a) BL&L had not completed the work required by its contracts and (b) the irreversible damage occurred when the employee was still spraying the property.

Brake testified that customers could contracted for a number of applications ranging from one to five. There is no evidence as to how many applications the customers whose lawns had to be restored had contracted for. The application at issue was the second. According to Brake's unrefuted testimony, some customers contracted for only two applications. Therefore, there remains a question whether BL&L's work under a contract was completed for any of the twelve customers affected. This open question does not affect, however, the resolution of the pending motion. Each policy included two definitions of excluded property damage relevant to the defective spraying. Each policy included an exception to the excluded property damage. Each exception applied to only *one* of the two exclusions. The remaining exclusion in each policy precludes coverage for the damage at issue. See **I.G.H. II, Inc. v. Selective Ins. Co. of S.C.**, 2007 WL 1378379 (Ohio Ct. App. 2007) (rejecting lawn care company's argument that products-completed operations exception applied to customers' claims arising from company's employee erroneous spraying of nonselective herbicide on customers' lawns; court noted that exception did not apply to

faulty workmanship exclusion – an exclusion identical to that in subparagraph (6) of both policies); **Silvers v. Erie Ins. Group**, 2005 WL 1205560 (Ohio Ct. App. 2005) (same).[9]

BL&L further argues that Midwestern is estopped from denying coverage on the grounds that there was no "occurrence" because a June letter referred only to the exclusions and not to there being an "occurrence." (Pl. Mem. at 5; Pl. Ex. 2B.) "If an insurer denies liability for a claim against an insured, specifying the grounds for that denial, the insurer *may* have waived or *may* be estopped from subsequently raising other grounds for denying liability under the policy." **Wood**, 980 S.W.2d at 53. Absent an insurer's express waiver, not present here, or conduct clearly showing an insurer's intent to relinquish a contractual right, also not present, an insured must show prejudice before waiver or estoppel is applied. **Id.** Midwestern cited subparagraphs (5) and (6) in the policy definition of "property damage" when denying coverage. Its failure to first argue that there was an "occurrence" – the burden of establishing which is on the insured – has not prejudiced BL&L. BL&L's estoppel argument fails.

## Conclusion

The damage at issue was caused by an employee of BL&L erroneously using the wrong product to spray customers' lawns. There was no "occurrence" as required for

---

[9]The Court is puzzled by BL&L's criticism of Defendants' citation to the two Ohio cases. The Missouri cases emphasized by BL&L, **Wood**, 980 S.W.2d at 50, and **Ratliff**, 927 SW.2d at 533, acknowledged their reliance on cases from other jurisdictions that resolved insurance disputes with factual patterns similar to the ones pending before the court.

coverage under the two polices. And, even if the spraying was an "occurrence," the business risk provisions in both policies would exclude coverage. Accordingly,

Accordingly,

**IT IS HEREBY ORDERED** that motion for summary judgment filed by defendants, Hawkeye-Security Insurance Company and The Midwestern Indemnity Company, is **GRANTED**. [Doc. 26]

**IT IS FURTHER ORDERED** that the motion of defendants, Hawkeye-Security Insurance Company and The Midwestern Indemnity Company, for partial summary judgment on the issue of vexatious refusal is **DENIED** as moot. [Doc. 52]

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  2nd  day of December, 2009.